Statement of the Case.
MONROE, C. J.
Defendant Is the appellant from a judgment decreeing a separation from bed and board in favor of his wife, and awarding her the permanent custody of their two minor children.
The cause of action stated in the petition is that, plaintiff having given defendant no provocation and having done everything in her power to make his home happy and comfortable, he “struck her, put his hand on his gun and threatened to kill her, choked her, *457 and put her out of the house.” Defendant denies that he struck plaintiff, alleges that she has done all that she could to make him unhappy and has threatened to kill him, “or have it done,” and he prays that he have judgment of separation, etc., and be awarded the custody of the children (who are said to be a boy and girl, aged four and two years, respectively).
The immediate trouble out of which this litigation has arisen occurred upon a morning following a night when defendant insisted on blowing out the night lamp which plaintiff kept burning in order to enable her to attend to the wants of her children and because she did not like to sleep in the dark. He says in his testimony:
“She said to me she would not sleep in the dark, and I said: ‘You don’t attend to your household, and you want to sit down, and don’t do anything, so I can’t get any work out of you; I will save what oil you bum at night.’ Then she said, You leave the lamp lit or else I will quit.’ I said: ‘Work, unless (meaning ‘or’) I will blow the lamp.’ Then she began talking to me that she would quit, talking loud, and I went up to her and told her to hush, and caught her clothes way below her throat to see if I could not frighten her and make her behave. She would not stop; she seemed like she wanted me to hit her. , I did not do so. I turned her loose without even shaking her.”
Plaintiff’s version is as follows :
“He said if things did not go like he wanted he would kill me, and he caught me and choked me, and then he caught the gun, and he told me, ‘If you don’t leave, I will shoot you,’ and I left as quick as possible. And then I went to Mr. Tony Gosselin, and Mr. Gosselin told me to go back; maybe he didn’t mean that; to try and stay with him. I went back and he put the light out and made me sleep in the dark with my children. The children would cry all night. He would not let me sleep in my bed with him any more, but would compel me to sleep on a quilt on the floor. I asked him, ‘Why don’t you let the light on? I am not used to sleeping in the dark, and I have to get up at night to see whether the children are covered,’ and he answered, ‘Before long, you will be in more darkness than this.’ ”
Plaintiff does not testify that defendant struck her, and there were no marks observable on her neck to show that he had choked her. He denies that he threatened to kill her, and with regard to the gun he testifies that it was in a rack over the door ; that when he had let her go she walked towards it, and it came to his mind that she had told him two weeks before that she would kill him, and that he therefore ran before her to the gun, to keep her from shooting him, but did not put his hand on it.
We are satisfied that defendant handled plaintiff, and none too gently, and that she should have left the room when he released her is not surprising; but his idea that she had designs- with respect to the gun merely because she went into the adjoining room, where the gun was hanging in a rack over the door, seems a little far-fetched. On the other hand, he went straight to the gun, and, whether he “drew” it (as plaintiff says he did) or not, his action must have indicated that he had the gun in his mind (as he admits that he did), or it would not have so impressed the plaintiff. However that may be, plaintiff, very shortly after the occurrences thus narrated, took her children and went to the house of a neighbor, who accompanied her to the office of Judge Gosselin, a justice of peace, to whom she complained that her husband had threatened to kill her. He, however, suggested that the threat might not have been serious, and advised her to return home and endeavor to continue to live there. She then returned to the neighbor’s house. In the meanwhile defendant had started out to look for her and the children, and, finding her sister in a near field, with several others (probably picking cotton), the following conversation took place (quoting the sister):
“A. He came in the field where I was working and asked me if I had seen my sister, his wife. I told him Yes,’ that she had told me that he had threatened to kill her, and that she stated she had to leave. He said, Yes; it *459 would be better for her to leave because you are liable to find her dead at many hours’ (meaning at any time).”
There are several other witnesses who testified to the same effect, their testimony being rather too literally corroborative, in view of the fact that people who are engaged in cotton picking are not usually clustered together. Defendant denies having made the statement thus attributed to him, but says that, having learned where plaintiff had gone, he went there also, and, going into the house, asked plaintiff what she intended to do, to which she replied that she intended to do what she was then doing (meaning to remain away from defendant’s house), and saying further, “You choked me and you wanted to kill me,” and after some “squabbling” (according to the testimony of the neighbor) defendant arose, and took one of the children off her lap, apparently with the purpose of carrying it away, when she remarked, “I will go where my children go if I have to take death,” to which he replied, “You can come out, but I don’t know you staying.” Plaintiff then got into the buggy in which defendant had driven up, and returned with him and the children to their home; that being in the afternoon of the day upon which she had left him, and the day being Thursday. That night, according to her uncontradicted testimony, her husband required her to sleep on the floor, and would not permit her to have a light, and the same on Friday night. On' Saturday she again left, and thereafter obtained possession of her children with the aid of the sheriff and (presumably) an order of court.
Opinion.
The judge a quo found that defendant “did beat, choke, and threaten to kill” plaintiff, and was unable to give any weight to the testimony to the contrary given by defendant and his brother. We find no evidence of beating, but we, too, are satisfied that there were threats and something very closely resembling choking. We also find that defendant’s charges of laziness were exasperating, his denial of plaintiff’s right to burn a night lamp unreasonable, and his monopolizing the bed while requiring plaintiff to sleep on the floor brutal.
The judgment appealed from is therefore affirmed.